**WESTERN GEOPHYSICAL COMPANY OF AMERICA, Inc., Plaintiff,**
v.
**BOLT ASSOCIATES, INC., Defendant & Third-Party Plaintiff,**
v.
**LITTON INDUSTRIES, INC., Third-Party Defendant.**

Civ. No. 11868.

United States District Court
District of Connecticut.

Oct. 25, 1969.

---

2. This ruling has been modified in part by the one which follows.

**1252**

William J. Doyle, Wiggin & Dana, New Haven, Conn., for plaintiff and third-party defendant.

Roland T. Bryan, Robertson, Bryan, Parmelee & Johnson, Stamford, Conn., for defendant and third-party plaintiff.

## RULING ON PLAINTIFF AND THIRD-PARTY DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS WITH RESPECT TO THE ANTITRUST COUNTERCLAIMS

BLUMENFELD, District Judge.

The facts of this case are set out adequately in an earlier ruling. 285 F.Supp. 815 (D.Conn.1968). To summarize, the case began as an action for breach of two agreements between Western Geophysical Company of America, Inc. (Western) and Bolt Associates, Inc. (Bolt) concerning rights and obligations with respect to a pneumatic acoustical repeater device (PAR), to be used in exploration for natural resources under the sea bottom. The second agreement, which is designated the "exclusive license agreement," provided in essence that Western would receive an exclusive license to use the PAR, that it would use its best efforts to sublicense others, and that it would keep 50% of the royalties paid by the sublicensees to Bolt through Western.

To the breach of contract action, Bolt has pleaded several defenses and counterclaims against plaintiff and against Litton Industries, Inc. (Litton), a Maryland corporation with its principal place of business in California.[1] Some of these defenses and counterclaims allege various violations by Western and Litton of the antitrust laws. For convenience, these will be referred to as the antitrust defenses and antitrust counterclaims.

Western and Litton have moved for summary judgment and judgment on the pleadings with respect to Bolt's antitrust defenses and antitrust counterclaims. A hearing was held and the motions were

[1]. Litton is designated as a third-party defendant in this case. While this designation may be technically inaccurate, there is no question that Bolt could have cited Litton in as an *additional* party (defendant), Fed.R.Civ.P. 13(h), so that complete relief could be afforded. Fed. R.Civ.P. 20(a). Litton is alleged to have owned all of the stock of Western at the time the conduct alleged in the counterclaims took place. Litton is apparently properly in the case under Rule 20 and all the parties have proceeded on that basis, although the file does not reflect that an order to cite them in was ever sought or obtained from the court. It does appear, however, that service of the counterclaims was made on Litton.

denied with respect to the antitrust defenses.[2] At the hearing, it developed that additional affidavits were necessary in order to test the sufficiency of the antitrust counterclaims, and additional time was granted the parties to obtain them. Those affidavits have now been received and a ruling on Western and Litton's motions for summary judgment and judgment on the pleadings with respect to the antitrust counterclaims asserted by Bolt is now in order.

### Bolt's Standing to Assert Antitrust Counterclaims

Western and Litton challenge Bolt's standing to assert any of its antitrust counterclaims on the ground that Bolt is not a competitor in the relevant fields of surveying and/or offshore sub-bottom exploration.[3] Chief reliance is placed on two cases from the Second Circuit, Productive Inventions, Inc. v. Trico Prods. Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956), and, more recently, SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir.), cert. denied, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969). Defendant Bolt does not agree that these cases are controlling and argues that it does not need to be a competitor to have standing to assert antitrust counterclaims. Moreover, claims Bolt, even if it is a requirement of standing that the claimant be a competitor, it is and has been a competitor in the relevant fields. This latter contention was asserted, somewhat belatedly, at the hearing on these motions.

■ Affidavits have now been received from both sides. The affidavit of Bernard Luskin, the president of Bolt, is sufficient to support the existence of a genuine issue as to a material fact; namely, whether Bolt is in fact in competition in the fields of surveying and/or offshore sub-bottom exploration. Accordingly, the motion for summary judgment on the issue of standing to assert these counterclaims must be denied.[4]

### The Antitrust Counterclaims

Defendant Bolt's antitrust counterclaims are those designated as the second, third, and fourth counterclaims in its answer. The second counterclaim

2. Ruling on Plaintiff and Third-Party Defendant's Motions for Judgment on the Pleadings and for Summary Judgment with Respect to Antitrust Defenses (D. Conn. June 27, 1969), 305 F.Supp. 1248 (1969). The necessary reconsideration here of some of the same legal issues presented by those motions has persuaded me to modify that ruling, as will more fully appear herein.

3. Section 4 of the Clayton Act, 15 U.S.C. § 15, permits private actions (and treble damages) by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws * * *."

4. In addition to their arguments on standing, Western and Litton challenge Bolt's right to recover on these counterclaims on the ground that, even if Bolt is a competitor, it has not alleged any injury arising out of the alleged antitrust violations. Instead, they contend, the injuries Bolt claims to have suffered resulted solely from the alleged breach of contract, and, therefore, the antitrust counterclaims should be dismissed as a matter of law.

Bolt has made the claim in general terms in all of these counterclaims that the anticompetitive acts of Western and Litton damaged it in a large amount. While it has not spelled out precisely what injuries resulted directly from antitrust violations (as distinguished from those resulting solely from the breach of contract), cf. Sam S. Goldstein Indus., Inc. v. Botany Indus., Inc., 301 F.Supp. 728 (S.D.N.Y.1969), an appropriate time for further explication of these matters is at a pre-trial conference. The different ways in which the defendant may have sustained damages from Western's alleged breach of the agreement to use its best efforts to sublicense others are: (1) loss of royalties which it would otherwise have shared; and (2) loss of profits attributable to Western's refusal to sublicense Bolt to use the device in its own business of offshore exploration. Only in the latter way could Bolt be injured qua competitor. Bolt has alleged enough to survive a summary judgment motion on these issues and further refinement of the pleadings at this stage would not be fruitful. Cf. Stanley v. Harper Buffing Mach. Co., 28 F.R.D. 579 (D.Conn.1961).

alleges that the concerted actions of Western and Litton violated both Section 2 of the Sherman Act (in that they constituted an attempt to monopolize, an illegal conspiracy, and an illegal combination with the intent to monopolize) and Section 7 of the Clayton Act (in that there was an illegal acquisition of an asset of a corporation, the effect of which would be to substantially lessen competition in interstate commerce and tend to create a monopoly in the relevant market).

■ Western and Litton contend this counterclaim is legally insufficient on a number of grounds. First, they argue, Bolt is ·guilty of improper procedure in lumping together in one counterclaim its claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act. This objection is not sufficient to warrant summary judgment or dismissal. *Cf.* Nagler v. Admiral Corp., 248 F.2d 319 (2d Cir. 1957).

Secondly, they assert that Bolt's claim under Section 2 of the Sherman Act is defective because it does not allege that the dominant position of Western in the relevant market amounts to a monopoly, or that Western or Litton intended to obtain monopoly power by suppression of the PAR, or that the alleged suppression created a dangerous possibility that such monopoly power could be effectuated. In essence, the charge is that Bolt has failed to allege sufficient facts to state a claim. The same kind of objection was raised with respect to defendant's antitrust de-

fense, and was found without merit.[5] It is equally unavailing here.

■ The objections to that part of Bolt's second counterclaim which invokes Section 7 of the Clayton Act are more substantial. Initially, the claim is made that no private action exists for violations of Section 7. While there has been *some difference of opinion on this* question until recently, the issue has now been resolved in the Second Circuit in Gottesman v. General Motors Corp. and E. I. DuPont De Nemours & Co., 414 F.2d 956 (2d Cir. Aug.13, 1969): "We agree * * * that a violation of section 7 of the Clayton Act does furnish a basis for a claim for money damages under the broad language of section 4 of the Act."

Western and Litton argue further that Section 7 does not apply to the agreement of April 16, 1963, by which Western acquired an exclusive license, to use the PAR, because that section was not intended to apply to a single acquisition and because no "asset" was acquired by Western under the agreement. These points raise interesting and difficult questions.[6] However, even assuming that a single acquisition of an exclusive license is within the purview of the act,[7] I now conclude that Section 7 is inapplicable to the present situation.

■ Clayton Act Section 7 does not prohibit all asset acquisitions, but only those whose "effect * * * may be substantially to lessen competition, or to tend to create a monopoly." The agree-

---

5. The earlier ruling, *supra*, note 2, stated: "It is true that there must be more than mere assertions that the antitrust laws have been violated, *see* Klebanow v. New York Produce Exch., 344 F.2d 294, 299 (2d Cir. 1965), and that [the allegations] taken in isolation seem a bit conclusory. However, the answer as a whole gives adequate notice of defendant's claims and conforms to the requirements of Rule 8 [Fed.R.Civ.P.]. To make defendant go through the motions of amendment on the basis of nice technicalities at this late stage of the litigation would be a needless exercise."

6. For a sample of the views of commentators on this issue, *see* Kadish, Patents and Antitrust, 13 Idea 83, 86–91 (1969) and Turner, The Patent System and Competitive Policy, 44 N.Y.U.L.Rev. 450, 460–63 (1969).

7. *See* Turner, *supra*, note 6, at 460: " * * * I shall simply assert categorically that Section 7 of the Clayton Act * * * applies to the acquisition of either a patent or an exclusive license." *Cf.* United States v. Lever Bros. Co., 216 F.Supp. 887, 889 (S.D.N.Y. 1963); United States v. Columbia Pictures Corp., 189 F.Supp. 153, 181–182 (S.D.N.Y.1960).

ment involved in this litigation, while labeled "exclusive license agreement," specifically required plaintiff Western to use its "best efforts to promote worldwide licensing and use of the licensed apparatus to government and non-profit institutions during the first two years * * * and thereafter * * * to all other possible sublicensees of such apparatus." This obligation to use best efforts to sublicense, which Western was required to assume in order to acquire the exclusive license, and which was an integral part of the acquisition agreement, negatives any possible anticompetitive taint on the acquisition itself and thus removes it from the scope of Section 7 of the Clayton Act.

This is not to say that the exclusive license agreement was not without some possible or potential advantage to Western. Thus, although Western, as exclusive licensee, was obligated to use best efforts to sublicense, it was also entitled to retain 50% of the royalties collected from the sublicensees. Moreover, it is clear that at least part of Western's object in acquiring the exclusive license was, as stated by its vice-president at his deposition, "to recoup any investment that we would have to make before the competition all dived in."

I fail to see, however, how these factors change the essentially pro-competitive nature of the agreement. The PAR was not, apparently, sufficiently tested or developed to be commercially marketable at the time of the agreement. Moreover, similar devices of larger size were contemplated but not yet developed. Additional money and technical expertise, not available through Bolt, were necessary to achieve commercial feasibility of the PAR.[8] Not until full recoupment of Western's investment was obtained, if ever, would it be possible to evaluate whether Western would receive any share of royalties so preferential as to have an anticompetitive effect.[9]

Defendant Bolt complains of an alleged suppression or conspiracy to suppress the PAR by Western and Litton. But suppression of the PAR or failure to use best efforts to promote worldwide licensing of the device would be, as alleged by Bolt in its first counterclaim, a breach of the exclusive license agreement. The alleged anticompetitive effect stems then, not from the *acquisition* of the exclusive license, which by its very terms would tend to *promote* competition, but from a misuse (breach of the agreement to sublicense) of the asset once acquired.[10] Thus, whether or not this alleged suppression materializes into future conduct actionable under some other section of the antitrust laws, it is not within the scope of the prohibitions of Clayton Act Section 7.

Insofar as Bolt's second counterclaim invokes Section 7 of the Clayton Act with respect to the acquisition of the

---

8. It is the view of at least one expert that the acquisition of an exclusive license in such a situation, even *without* the commitment to sublicense, is not covered by Clayton Act Section 7, Turner, *supra*, note 6, at 462, the reasoning being that without this inducement the money for research and development would not be forthcoming and the invention would not be available to *anyone*.

9. I think it clear that Western's obligation to use best efforts to sublicense under the acquisition agreement must be read to require the setting of reasonable royalties for sublicensees. *See* United States v. United Shoe Mach. Corp., 110 F.Supp. 295, 354 (D.Mass.1953), aff'd, 347 U.S. 521, 74 S.Ct 699, 98 L.Ed. 910 (1954).

10. Defendant Bolt alleges, additionally, that Western entered the agreement with the intent not to honor the provisions regarding sublicensing. Assuming the truth of that allegation, and conceding that an anticompetitive motive is thus assigned to the acquisition of the exclusive license, it still appears that the acquisition is not covered by Section 7. Again, what Bolt complains of is a secret motive in contravention of the terms of the acquisition of the license. It is not the effect of the acquisition of the license but the effect of future conduct in violation of the acquisition agreement which defendant claims might tend to lessen competition.

**1256**

exclusive license, the motion for summary judgment is granted and that part of the counterclaim is dismissed.

■■■ Bolt's third counterclaim alleges that Western and Litton "and other parties not now known" conspired and are conspiring to group boycott Bolt. Western and Litton argue that this counterclaim should be dismissed for Bolt's failure to specify which section of the antitrust laws it is proceeding under and to allege sufficient facts to state a claim. It is settled that group boycotts violate the antitrust laws, Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and Bolt in its answer, counterclaims, and affidavits has alleged sufficient facts to give notice to Western and Litton of the nature and substance of its claim. Pre-trial discovery may be resorted to for further elucidation if desired.

The fourth counterclaim alleges that Western and Litton have conspired to suppress the use of the PAR and that that suppression is in violation of Section 2 of the Sherman Act. The fatal defect here, according to Western and Litton, is that Bolt has not indicated which of the prohibitions of Section 2 it is invoking, how the alleged suppression amounts to any of the activities prohibited by section 2, or the causal relation between the suppression and the alleged damage to Bolt. Moreover, they claim, Bolt is merely restating its other counterclaims. These objections amount to no more than a claim that Bolt has not pleaded enough facts to support its conclusory allegation that Western and Litton have violated the antitrust laws. Enough material has been filed and enough discovery had to give the parties adequate notice of the claims being asserted.

### Conclusion

The motions of plaintiff and third-party defendant for summary judgment with respect to defendant's counterclaims three and four are denied. With respect to that part of counterclaim number two which invokes Clayton Act Section 7, the motions are granted; with respect to the rest of counterclaim number two (that part invoking Sherman Act Section 2), the motions are denied.

So ordered.