**CONGOLEUM INDUSTRIES, INC.**
**v.**
**ARMSTRONG CORK COMPANY.**
Civ. A. No. 41762.

United States District Court,
E. D. Pennsylvania.

Aug. 16, 1973.

Opinion on Defense of Misuse of Patents
Oct. 5, 1973.

Drinker Biddle & Reath by Lewis H. Van Dusen, Jr., Patrick T. Ryan, Philadelphia, Pa., Braumbaugh, Graves, Donohue & Raymond by Even M. Graves, Joseph D. Garon, Allan H. Bonnell, Sullivan & Cromwell by Michael M. Maney, William T. Stephens, New York City, Ralph M. Jerskey, Richard T. Laughlin, Kearny, N. J., for plaintiff.

Schnader, Harrison, Segal & Lewis by Edward W. Mullinix, Philadelphia, Pa., Morton, Bernard, Brown Roberts & Sutherland by W. Brown Morton, Jr., Malcolm L. Sutherland, Washington, D. C., Howson & Howson by Dexter N. Shaw, Gordon S. Rogers, Philadelphia, Pa., Donovan, Leisure, Newton & Irvine by Sanford M. Litvack, New York City, for defendant.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

On February 23, 1972, this Court held that the United States patents in suit, assigned to the plaintiff, Congoleum Industries, Inc. (Congoleum), were valid and infringed by the defendant, Armstrong Cork Company (Armstrong).[1] Presently before the Court is Defendant's Motion Under Rule 60(b)(2), Fed.R.Civ.P. to Reopen the Record to allow the defendant to present newly discovered evidence that its accused product and process do not infringe the patents in suit.

The patents in suit and the accused product and process are concerned with the art of chemical embossing. At trial, the infringement issue centered on whether embossing obtained in the defendant's product and process is achieved by means of an inhibitor which substantially alters the temperature at which at least some of the blowing agent decomposes. Congoleum contended that benzoyl peroxide, employed as a catalyst in defendant's process, is an inhibitor within the meaning of the patents in suit. The plaintiff presented convincing evidence of infringement when it established, through the testimony and reports of Dr. Myer Ezrin, that there is a significant difference in residual blowing agent between the depressed areas of Armstrong's product, where an ink containing benzoyl peroxide is printed, and the raised areas, where benzoyl peroxide is not present; and that there is a direct relationship between the amount of foam formed in the raised and depressed areas of defendant's commercial products and the amount of residual blowing agent found in these areas. As an explanation of these phenomena, the defendant, through the testimony and reports of Dr. Nathaniel Hager, argued that greater decomposition of blowing

1. *See*, Congoleum Industries, Inc. v. Armstrong Cork Co., 339 F.Supp. 1036 (E.D.Pa.1972).

agent occurs in the raised areas because these areas are at a slightly higher temperature at the time of the blowing agent decomposition reaction. Dr. Hager stated that this higher temperature is the result of heat generated by thermal polymerization of the monomer in the raised areas which occurs after heat generated in the depressed areas by a catalytic reaction has been dissipated.[2] Armstrong further contended that embossing in its product is obtained by physically restricting the expansion of decomposed blowing agent in certain areas, thus causing those areas to achieve less foam growth than other areas. After considering the extensive evidence presented on the issue of infringement, this Court concluded that the difference in residual blowing agent between the raised and depressed areas of defendant's product could not be accounted for on the basis of Dr. Hager's theory. The Court discounted defendant's physical restriction theory as a significant cause of its embossing, and found that the decomposition temperature of the blowing agent in defendant's commercial product was substantially altered such that an embossed effect, which would enhance the saleability of defendant's commercial product, was obtained.

The defendant, in its present motion, recognizes that the Court correctly discounted its earlier theory that embossing in its product and process is caused by physical restriction of blowing agent expansion in the depressed areas resulting from the rheological change which takes place in those areas, but Armstrong now asserts that "mortar-broadening" is the mechanism whereby the rheological change produces embossing in its product. Armstrong argues that its present "mortar-broadening" postulate accompanied with affidavits and data book would probably change the decision of February 23, 1972 insofar as the Court found that there is a direct relationship between the amount of foam formed in the raised and depressed areas of defendant's commercial products and the amount of residual blowing agent found in those areas and the Court's conclusion that an amount of embossing sufficient to enhance the saleability of defendant's commercial product can be directly attributed to the difference in the amount of residual blowing agent found in the raised and depressed areas.

An affidavit of Dr. Hager in support of the defendant's motion states that he had a new insight into the mechanism whereby the Armstrong process works in September 1972 after having extensive consultation with the expert witnesses concerned with similar patent litigation in Great Britain. He then ran extensive tests at defendant's plant in Montreal, Canada, where the line conditions are such that mortar-broadening can be readily observed. He states that the line conditions in Lancaster, Pa., where earlier tests were run, were not suitable for observing the effect. In Part V of the data book in support of the defendant's motion, Dr. Hager explains that the viscosity difference between land and mortar materials (due to crosslinking of the monomer in the mortar areas) is the only plausible explanation for the "peak-and-valley" profile which is characteristic of the Armstrong emboss. He states that when blowing begins, both mortar and land areas rise, and, at the edges where the land and mortar areas meet, the mortar material expands laterally into the less viscous land material, as well as upward. This vertical and horizontal motion results in ridges at the edge of the lands and valleys at the edge of the mortars in defendant's product. At distances remote from the land-mortar boundary, the mortar material expands straight up because it is surrounded by material of equal viscosity. Dr. Hager's affidavit indicates that data compiled by Dr. Reuwer, which measured blowing agent consumed in the edge areas, as well as the

2. Dr. Hager's theory was disputed by several scientists who testified for Congoleum.

centers of lands and mortars, show that foam height in defendant's product is not directly related to the amount of blowing agent consumed. However, Dr. Hager further states that there is a difference between foam height at the center of the broad mortar regions and at the center of the land areas away from the ridged edges which can be related to the amount of embossing induced by the difference in residual blowing agent recognized to be present in the defendant's product.[3]

The ridge and valley profile, which is a characteristic of the defendant's product, was described by several witnesses testifying for each side at trial.[4] Dr. Newton, an Armstrong witness, testified that blowing agent bubbles carried mortar material into the lands.[5] The data book offered in support of the present motion states that Dr. Newton's observation was a plausible explanation for the ridge at the land edge and the valley at the mortar edge but that it suffered from lack of proof. Dr. Ezrin, whose proportionality tests were a primary basis for the Court's finding of infringement testified as follows:

"Q. Well, surely you don't disagree with the fact that the profilometer very clearly reveals the existence of ridges on the side of all—

A. Oh, I don't deny the existence of ridges. Our measurements are outside the so-called ridge area.

The ridge area really constitutes a fairly small fraction of the whole sample and—

Q. Well, it may constitute a small fraction of the sample, but where did the material come from that is in the ridge, in your opinion?

A. Well, I think one very likely possible explanation is from the movement of the foam material itself, pushing from the mortar area into the

—slightly into the land area, causing the land area to raise.

The basis I have for saying that is experiments which I am familiar with that were done at Congoleum using plasti—gelled sheet which was then blown side by side, in which there was no cross linking, but there was a difference in the—in the molecular weight of the—of the material on the two sides and in which one was colored black, so that it could be seen readily against the other one, and when these were blown to approximately the commercial condition, the effect, a ridge effect was produced very much like that which is seen in the typical Armstrong product." (Tr. 4452, 4453)

In summarizing the evidence at trial the defendant argued:

"Well, how do they get to be ridges?

Well, we think something is pushed out from under the mortar area.

Well, if something is pushed out from under the mortar area to raise the land area, then how, possibly, can the elevation in the mortar area remain proportional to the gas blown? It can't. Something has caused this stuff to go sidewise, not up—everybody has agreed about that—and that, we say, is the reason why, right off, we have gone beyond our necessity to show that there is a sufficient explanation for everything in our product, right there; we have a sufficient explanation of the embossing." (Tr. 4677)

In the Court's view, the theory of "mortar-broadening" was presented at trial to explain the peaks and valleys which exist at the edges where the land and mortar areas meet in the defendant's product. The evidence in support of this explanation for the ridge effect

---

3. Dr. Hager minimizes this relationship, however, by stating that the foam height difference it produces in defendant's products is much less than that which exists between the ridges and valleys.

4. *See*, Tr. at 681, 2029, 2343, 2616, 2827, 2908, 2934, 4449, 4452.

5. *See*, Tr. at 2934.

was, however, limited to the scientific opinions of experts for each side. The defendant's contention that its discovery of "mortar-broadening" caused it to make measurements of residual blowing agent to refute the Congoleum proposition that foam height is proportional to the amount of residual blowing agent remaining in the products is not persuasive. Even assuming that the "mortar-broadening" postulate was not presented at trial, these measurements should have been made in support of the other Armstrong postulates and/or to refute Dr. Ezrin's tests. There is no basis for disturbing Armstrong's earlier decision not to present these measurements at trial. At any rate "mortar-broadening" is a postulate which is limited to explaining the ridge effect which exists at the edges where land and mortar areas meet in the accused product. This postulate does not refute Dr. Ezrin's proportionality tests [6] or the Court's determination that an amount of embossing sufficient to enhance the saleability of defendant's commercial product can be directly attributed to the difference in the amount of residual blowing agent found in the raised and depressed areas.

The affidavit of Dr. Goodyear, a research manager at Armstrong, submitted in support of defendant's motion refers to a "newly extended calorimetric technique, . . . which for the first time in this lawsuit provides a means to measure directly the temperatures at which the blowing agent is decomposing in the Armstrong and Congoleum processes." Dr. Goodyear further states

that "This new technique has been subjected to scientific scrutiny and has withstood such scrutiny as evidenced by its publication, *Review Scientific Instruments*, 43, 1116 (1972), in August, 1972." This publication which is authored by Dr. N. E. Hager, Jr., and which was received by *The Review of Scientific Instruments* on March 27, 1972, explains a method used to obtain specific heat data at heating rates exceeding 500° F./min. by using a modification of the thin foil calorimeter described in earlier publications by Dr. Hager.[7] Armstrong's brief in support of this motion states that "The newly discovered evidence includes experimental evidence using a newly extended calorimetric technique . . . . This technique is capable of measuring accurately temperatures under the conditions of the Armstrong process, i. e., temperature differences of ± 1° F. at heating rates on the order of 200° F./min. at temperatures on the order of 400°F." [8] Dr. Hager's affidavit in support of the defendant's motion reaffirms his view expressed at trial that the mortar areas blow less than the land areas because they are cooler during the blowing stage of the process,[9] but Dr. Hager does not make reference to a new temperature measuring device.

At trial, Dr. Hager's testimony and technical reports indicated that his thin foil stack calorimeter was capable of comparing sample temperatures with better than 1° F. precision at heating rates normally encountered during manufacture of the accused Armstrong products.[10]

6. As noted earlier, Dr. Ezrin stated that his measurements were made outside the ridge area (Tr. 4449, 4452).

7. *See*, Part I of Dr. Hager's report in support of the defendant's motion at 6. *See also*, D.E. 156.

8. Brief In Support Of Defendant's Motion Under Rule 60(b) at 6. As Part I of the Hager report at 24, 25 indicates, this statement in defendant's brief refers to precision in comparing sample temperatures rather than absolute accuracy.

9. *See*, D.E. 227. In this exhibit Dr. Hager states that at the instant the blow temperature is reached, the land areas have a net temperature elevation exceeding 2° F. He indicates that the mortar areas are initially hotter due to a catalytic reaction, but that the production line speed and product backing are such that heat in the mortar areas is dissipated before a thermal reaction occurs in the land areas.

10. *See generally*, Tr. 3185–3189, 3202, 3226; D.E. 227, D.E. 252. Defendant's exhibit 227 which is dated Sept. 22, 1970, and based on

While Dr. Hager's modified thin foil calorimeter may be capable of obtaining specific heat data at much higher heating rates than those present in the Armstrong production line, there has been no showing that the modified calorimeter has an improved capability in the temperature range of interest here. Having concluded that for the purpose of this litigation there is nothing new about defendant's "newly extended calorimetric technique," the Court will not consider the data obtained using it.

The defendant's data book also refers to a "newly recognized ink thickness effect" [11] which Armstrong contends may also contribute to a land-mortar temperature difference during blowing. The defendant states that the extra mass caused by ink thickness in the mortar areas will cause these areas to heat slower. At page 11 of defendant's

data compiled in Sept. 1969, states in the introduction:

"The work reported here is done with heating rates of 90° F./min., and current work is being done at 250° F./min., a rate equalling that encountered in the production oven. Also of importance is the fact that the foil calorimeter method is ideally suited for continuous comparison of temperatures of catalyzed and uncatalyzed portions of the subject plastisol with both portions simultaneously undergoing the same heating process."

At trial in response to a question asking whether he had ever carried out any test at a heating rate of 250° F., Dr. Hager stated that: "[I] am now working with a stack calorimeter, measuring the specific heat of polymer at four and five thousand degrees per minute," but he stated that he never made measurements heating the accused product in the calorimeter at 250° F./min. (Tr. 3226). He also testified that "[D]uring the crucial time when thermal polymerization is going on, the stack calorimeter is heating the material at the same rate that it is heated in the plant." (Tr. 3202). The precision of the foil calorimeter was given as 1% at page 6 of Defendant's Exhibit 227, and Dr. Hager testified that when comparing small temperature differences this permits recording differences with an error of less than 1° F.

11. See, Part IV of the data book in support of defendant's motion.

exhibit 227, an "ink thickness" effect is clearly recognized in the passage. "[T]his is to be expected because the extra mass of the catalyst ink slows down the heating of the catalyzed side." This effect is clearly not newly discovered evidence.

While the defendant's statement that this Court's decision of Feb. 23, 1972 was "taken by all concerned to be the last expression by this Court of its views on patent validity and infringement" [12] is undoubtedly true, the Court's holding that the patents in suit were valid and infringed was an interlocutory adjudication [13] and the provisions of Rule 60(b), Fed.R.Civ.P., are, therefore, not applicable.[14] For the reasons discussed above, however, the Court declines to exercise its discretion to reopen the record to allow the defendant to present additional evidence.

12. Brief In Support Of Defendant's Motion Under Rule 60(b)(2), Fed.R.Civ.P.

13. See, Final Pretrial Order at 2, where the Court states:
*Issues Deferred*
Defendant's motion for leave to amend its answer to assert patent misuse was denied without prejudice to its renewal after the trial on the issues of validity and infringement, if not made moot thereby. The plaintiff's right, if any, to an accounting and an injunction is deferred until after such misuse issue has been disposed of by this Court."
After trial, this Court granted the defendant's motion to amend its answer to assert the defense of patent misuse. The defendant also filed an appeal pursuant to 28 U.S.C. § 1292(a)(4). The defendant's subsequent motion filed at the Court of Appeals seeking leave to file its present motion in this Court was granted.

14. See, Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 47, 48, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); Manos v. Trans World Airlines, Inc., 324 F.Supp. 470, 488 (N.D.Ill.1971); Graci v. United States, 301 F.Supp. 947 (E.D.La.1969); Waco-Porter Corp. v. Tubular Structures Corp. of America, 222 F.Supp. 332 (S.D. Cal.1963); Triumph Hosiery Mills, Inc. v. Triumph International Corp., 191 F.Supp. 937 (S.D.N.Y.1961); See also, 6A Moore's Federal Practice, ¶ 59.03, ¶ 59.04 [13] (2d Ed.1972).

## OPINION ON DEFENSE OF MISUSE OF PATENTS

This Court has held that the United States patents, in suit, assigned to the plaintiff, Congoleum Industries, Inc. (Congoleum), are valid and infringed by the defendant, Armstrong Cork Co. (Armstrong).[1] Presently before the Court is Armstrong's defense that Congoleum has misused the patents in suit. Armstrong requests that the Court bar enforcement of the patents until such time as Congoleum has fully abandoned its alleged illegal practices and the consequences of those practices have been dissipated.

■■ The public policy of promoting the progress of the useful arts[2] is achieved by granting a limited monopoly to an inventor who fully discloses his invention to the public in a United States Patent. This grant of the right to exclude others from making, using, or selling the invention in the United States for a term of 17 years[3] enables the patentee to secure financial reward for his invention. The public interest, however, forbids a patentee from using his patent "in such a way as to acquire a monopoly which is not plainly within the terms of the grant."[4] As the Supreme Court stated in Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 493, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1941):

"Undoubtedly 'equity does not demand that its suitors shall have led blameless lives,' . . . but additional considerations must be taken into account where maintenance of the suit concerns the public interest as well as the private interests of suitors. Where the patent is used as a means of restraining competition with the patentee's sale of an unpatented product, the successful prosecution of an infringement suit even against one who is not a competitor in such sale is a powerful aid to the maintenance of the attempted monopoly of the unpatented article, and is thus a contributing factor in thwarting the public policy underlying the grant of the patent. Maintenance and enlargement of the attempted monopoly of the unpatented article are dependent to some extent upon persuading the public of the validity of the patent, which the infringement suit is intended to establish. Equity may rightly withhold its assistance from such a use of the patent by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated."

■ The burden of establishing patent misuse is on the party asserting it.[5] It is not necessary, however, for the party asserting this defense to prove it has been injured by the alleged misuse. The Morton Salt case states:

"It is the adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct, which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent." (p. 494, 62 S.Ct. p. 406.)

Armstrong's allegations that Congoleum has misused the patents in suit fall generally into the following categories: (1) the Congoleum—Inmont agency

1. *See*, Congoleum Industries, Inc. v. Armstrong Cork Co., 339 F.Supp. 1036 (E.D. Pa.1972); Armstrong's Motion Under Rule 60(b)(2), Fed.R.Civ.P., was denied on August 16, 1973.

2. *See*, U.S.Const. art. I, § 8, cl. 8; United States v. Univis Lens Co. 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942); United States v. Masonite Corp., 316 U.S. 265, 278, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942).

3. *See*, 35 U.S.C. § 154.

4. Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L.Ed. 376 (1944).

5. *See*, Benger Laboratories Ltd. v. R. K. Laros Co., 209 F.Supp. 639 (E.D.Pa.1962), aff'd, 317 F.2d 455 (3d Cir. 1963).

agreement, (2) royalty fixing, (3) discriminatory royalties, (4) violations of the "Lear v. Adkins" doctrine, (5) pre-issuance royalties, (6) post-expiration royalties.[6]

### The Congoleum—Inmont Agency Agreement

On May 19, 1967, Congoleum entered into an agency agreement with Inmont Corporation (Inmont)[7] for the purpose of encouraging commercialization of the inventions of the patents in suit.[8] The agency was limited to products defined in paragraph 1(a) of the agreement, and did not include the right to license in the floor covering field, where Congoleum had expertise, or in other specified fields such as the automotive area. The agreement provided that Inmont would receive a 25% commission on royalties and called for it to expend substantial amounts of money in development work.[9] Inmont, which is the world's largest manufacturer of printing inks if all types of inks are grouped together, believed that its involvement in the commercial utilization of the inventions would enhance its image to its customers and widen the utilization of inks. Inmont became the second largest producer of automotive paints through an acquisition which was made in 1966, and it also sells coated fabrics.[10]

The agency agreement required that the "label license" [11] method of licensing be employed, but it also required Inmont to grant a "user license" [12] to anyone who requested it; and the agreement further required Inmont to grant other vendors the right to grant label licenses at Congoleum's request.[13] No request for any license was ever refused by Inmont.[14] User licenses were issued under the agency agreement to L. E. Carpenter & Co. (Carpenter), Borden Chemical Co. (Borden), Texon, Inc. (Texon), and Litton Business System, Inc. (Litton); however, no royalties based on percentage of net sales have been paid by any of these licensees.[15] This agreement was terminated by Congoleum on March 24, 1971 because of Inmont's failure to make an annual advance payment of royalties.[16]

Armstrong has presented the Congoleum-Inmont agency agreement primarily as a background for its more specific allegations of misuse to follow. There is no evidence supporting a conclusion of patent misuse in conjunction with the agency agreement.

### Royalty Fixing

On March 25, 1969, Congoleum granted Inmont a license to practice the invention in the automotive field including

6. At trial Armstrong also sought to introduce evidence in support of an allegation that the patents in suit were misused because of their involvement in "package licensing and complementary anticompetitive acts." Based on Armstrong's failure to comply with a pretrial order which was designed to clarify and narrow the issues in this complex patent case, the Court granted Congoleum's motion to preclude evidence in support of this allegation (Tr. 31–40, Jan. 8, 1973, Tr. 9, Jan. 9, 1973).

7. Inmont's predecessor was named Interchemical Corporation. Inmont and Interchemical are both referred to herein as Inmont.

8. See, DX–3, Stipulated Fact (SF)–3.

9. See, Tr. 74, 94.

10. See SF–3.

11. Pursuant to this method a license is granted at a fixed royalty with the sale of products used in the practice of the invention. This method facilitates the broad use of an invention.

12. Pursuant to this method a licensee is granted the right to practice the invention regardless of the source from which the materials used in the patented process are purchased.

13. See, SF–3.

14. See, Tr. 79, 82–84.

15. See, SF–9.

16. See, SF–3.

the right to grant sublicenses.[17] This agreement was cancelled by Congoleum on April 11, 1972 for failure of Inmont to make a required annual payment. No sublicenses were granted under the agreement.

Initially, the defendant contends that paragraph 12(a), which limits the royalty rate Inmont can charge to sublicensees designated by Congoleum, is illegal *per se*. Armstrong relies on numerous cases which have held price fixing to be illegal *per se*,[18] but has not supported its argument with a single decision that has held it unlawful for a patentee to set royalty rates in licenses and sublicenses or any reason why this provision in this license agreement is anticompetitive. The presumption of *per se* illegality which is applicable to certain arrangements which the courts have concluded through experience and analysis have a pernicious effect on competition and lack of any redeeming virtue is not applicable here.[19] While Inmont was entitled to reap some profit for administering the sublicense program, paragraph 12(a) insured that sublicensees designated by Congoleum would receive an equitable royalty rate.[20] This does not amount to patent misuse.

17. *See,* DX–8; SF–4: the agreement reads in pertinent part:

"GRANT:

1. (a) LICENSOR grants LICENSEE a non-exclusive license with the right to grant sub-licenses to practice the inventions of the Patents in the Territory for the production of Products.

\* \* \* \*

"MOST FAVORED LICENSE

11. If LICENSOR hereafter grants any license for the practice of an invention of the Patents for manufacturing Products at a rate of royalty lower than that stated herein for such Product, LICENSOR will promptly so advise LICENSEE and such lower royalty rate will be applicable to the license granted hereunder effective as of the effective date of such other more favorable license.

"EXCLUSIVE PERIOD . . .

12. (a) LICENSOR will not grant a license for the manufacture, use or sale of Products in the Territory to any third party prior to January 1, 1973. At all times, however, LICENSOR retains the right to make, use and sell Products and at any time when so requested by LICENSOR, LICENSEE will grant sub-licenses for the manufacture, use and sale of Products in the Territory to any third parties designated by LICENSOR. The terms of any such sub-license will be equivalent to those herein stated except that the royalty rates will be designated by LICENSEE provided, however, that LICENSEE may not designate a rate for any Products higher than the lowest rate then in effect for such Products under any sub-license granted hereunder then outstanding or, if a sub-license for such Products has not been granted, a rate not higher than one percentage point higher than the rate applicable to such Products stated in Section 2(a) hereof except that for exterior decals the maximum rate is one half percentage point higher and for wet compound the maximum rate is one cent higher per pound.

"(b) On and after January 1, 1973, if LICENSOR grants a license for the manufacture, use or sale of Products in the Territory and there is then in effect any active sub-license hereunder for such Products ('active sublicense' being a sublicense under which royalties have been paid for either the last quarter or the last year at an annual rate of at least $5,000), such license will not, without LICENSEE's prior written consent, provide for a royalty rate for such Products lower than the most recently fixed rate then in effect for such Products under any such sub-license."

18. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Ring. v. Spina, 148 F.2d 647 (2d Cir. 1945); Goldfort v. Virginia State Bar Ass'n, 355 F.Supp. 491 (E.D.Va.1973).

19. See, Carter—Wallace, Inc. v. United States, 449 F.2d 1374 (Ct.Cl.1971); *see also*, the discussion of "most favored licensee" provisions in Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., 218 F. Supp. 1, 51 (D.Md.1963), aff'd per curiam 327 F.2d 497 (4th Cir. 1964).

20. This rate would be the established rate if Inmont had granted prior sublicenses or a

Next, the defendant contends that paragraph 12(b) [21] is illegal *per se* because it eliminated competition between Inmont and Congoleum in the granting of licenses after January 1, 1973, and because it was inserted for the benefit of Inmont, the licensee.

Congoleum obviously felt it could reap higher royalty earnings under its patent rights in the automotive field if it initially granted Inmont the exclusive right to grant sublicenses in that field. Paragraph 12(b) which was to be effective on January 1, 1973, when Congoleum could commence granting licenses in the automotive field, would have prevented Congoleum from issuing licenses at a royalty rate lower than that charged by Inmont to Inmont's sublicensees. In the absence of such a provision, if Congoleum licensed others at a royalty rate lower than the rate charged to Inmont's sublicensees, those sublicensees, under their "most favored licensee" clause would be entitled to the same rate. This would not only eliminate any profit Inmont was receiving for its efforts in sublicensing, but would actually cause Inmont to lose money because it would be administering the sublicense program at its own expense. In the Court's view, paragraph 12(b) was inserted for the legitimate purpose of encouraging Inmont in its pioneering efforts in promoting the inventions of the patents in suit in the automotive area. It is highly conjectural that absent paragraph 12(b) there would have been competition after January 1, 1973 in the granting of patent licenses between Congoleum, the patent owner, and Inmont, a licensee. Armstrong's argument that this provision was unlawful because it was inserted for the benefit of Inmont, a licensee, is also without merit. A provision in a patent license agreement is not unlawful simply because there is some benefit to the licensee.[22] Unlike the cases cited by Armstrong [23] where patent licenses were employed to restrain competition through provisions which granted licensees the power to veto future licenses of the patent rights to their competitors, Inmont had no power to restrict others from obtaining rights under the patents in suit.

Even assuming there was some merit to Armstrong's contentions with regard to paragraph 12(b), there would be no basis for a finding of patent misuse in the present case because the competition Armstrong alleges was foreclosed by paragraph 12(b) could not come into existence until January 1, 1973. Armstrong, citing General Tire & Rubber Co. v. Firestone Tire Co., 351 F. Supp. 872 (N.D.Ohio 1972), contends that the termination of the agreement makes no difference with respect to whether the agreement constituted a misuse during its existence. It is, of course, true that the failure to enforce an illegal provision will not afford relief from patent misuse, because the restraining influence of an illegal provision may constantly effect competition. As the Court stated in F. C. Russell Co. v. Consumers Insulation Co., 226 F.2d 373, 376 (3d Cir. 1955): "The inchoate threat which these circumstances engender hangs in the air and we may doubt that that threat is without its effect in a highly competitive market." [24] The present case is distinguishable, however,

---

rate not to exceed 1% higher than the rate paid by Inmont if Inmont had not granted a prior sublicense.

21. *See*, note 17, *supra*.

22. *See*, Technograph Printed Circuits, *supra* note 19; Western Geophysical Company of America v. Bolt Associates, Inc., 305 F. Supp. 1251 (D.Conn.1969), appeal dismissed, 440 F.2d 765 (2 Cir.).

23. *See*, McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965),

cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); United States v. Krasnov, 143 F.Supp. 184 (E.D.Pa.1956); aff'd per curiam 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed. 2d 21 (1957).

24. *Accord*, United Shoe Machinery Corp. v. United States, 258 U.S. 451, 458, 42 S.Ct. 363, 66 L.Ed. 708 (1921); Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782 (9th Cir. 1964).

because the agreement was terminated before it was possible for the alleged competition between Congoleum and Inmont to come into existence.

The defendant also contends that it was illegal *per se* for Congoleum to set the royalty rate for the wall covering portion of the sublicense from Inmont to W. R. Grace & Co. (Grace).[25] Again, Armstrong has failed to set forth any reasons why this agreement is anticompetitive in nature or effect, and the Court finds no basis to support a conclusion of patent misuse.

### Discriminatory Royalties

On April 7, 1969, Inmont was licensed to practice the inventions of the patents in suit to produce products in the field of wall covering.[26] The agreement provided that the licensee would pay royalties of seven cents for each pound of foamable composition mix used in the practice of the inventions. Subsequently licenses to produce products in the field of wall covering were granted to Carpenter,[27] Borden,[28] and Grace.[29] These license agreements provided for a royalty of 5% of the net sales price of all products made under the patents in suit.[30] All licensees, including Inmont, were subject to termination if they did not develop royalties of at least $5,000 annually.[31] Carpenter, Borden and Grace have not reported any sales of

products in the wall covering field produced under the patents in suit.[32] To date, Inmont has produced a small amount of coated fabric which would have generated about $1,000 in royalties, but this, of course, is much less than their minimum annual royalty.[33]

The defendant contends that Congoleum has misused its patents by charging discriminatory royalties to competing licensees. Armstrong relies on Laitram Corp. v. King Crab, Inc., 244 F.Supp. 9, mdf'd 245 F.Supp. 1019 (D. Alaska 1965); La Peyre v. F. T. C., 366 F.2d 117 (5th Cir. 1966); Peelers Co. v. Wendt, 260 F.Supp. 193 (W.D.Wash. 1966). These cases, often referred to as the *Shrimp Peelers* cases, held that a patentee cannot charge discriminatory rates to competing licensees.[34] The facts showed that the owners of a patent on a shrimp-peeling machine[35] had charged twice as high a royalty rate to shrimp packers in the Northwest as they had charged to packers on the Gulf Coast. The Northwest and Gulf Coast packers were in competition and the court in *Laitram* found "the rate fixed in the Northwest and Alaska areas was prohibitive, such that these canneries could not economically compete with shrimp processors in the Gulf area."[36]

In the present case there is no basis for concluding that competition may be adversely effected because Armstrong has failed to introduce evidence

---

25. See, SF–8, 9; DX–10, 11, 35, 36; PX–54; Tr. 111, 112, 145, 146, 150, 151.

26. *See*, DX–9; SF–5.

27. *See*, DX–11; SF–6.

28. *See*, DX–27; SF–7.

29. *See*, DX–36; SF–8.

30. Inmont was empowered to grant licenses to practice the invention in the wall covering field under its agency agreement with Congoleum and preferred to license on the basis of cost per pound of plasticol used. Congoleum, however, preferred to license on the basis of percent of net sales. It was agreed that Congoleum would attempt to negotiate a license with a third party on a net sales basis at a rate not to exceed 5% and, if successful, that rate would apply to all future

wall covering licenses. Congoleum licensed Carpenter at 5% and thus set the royalty for future licenses to be granted by Inmont. (*See*, Tr. 84, 105, 106, 139, 144; DX–3, para 17, DX–10).

31. *See*, DX–9, 11, 27, 36.

32. *See*, SF–9.

33. *See*, Tr. 103–105.

34. In *Laitram* the court found patent misuse. The court in *La Peyre* found a violation of Section 5 of the Federal Trade Commission Act, and in *Peelers* the court found a violation of Section 2 of the Sherman Act.

35. The patent owners also retained ownership and control of a shrimp packing company on the Gulf Coast.

36. 244 F.Supp. 9 at 17.

that Inmont and any of the other licensees compete in any relevant market. The varieties of, and markets for, products produced under the patents in suit in the wall covering field are numerous. Additionally, the Court is not persuaded that the royalty rates set by Congoleum were discriminatory. The royalty actually paid under any royalty basis will depend on many factors including the nature of the substrate, thickness of the coating, price range of the finished product and the amount of scrap.[37] While the evidence shows that Inmont considered the rate of seven cents per pound of foamable composition used to be somewhat advantageous for its particular circumstances,[38] it does not necessarily follow that the rate of 5% of net sales price of products produced under the patents was discriminatory. In this case an attempt to compare these royalty rates would produce highly speculative results because no sales have been reported under the percent of net sales rate and a negligible amount of foamable composition has been used under the cost per pound of composition rate.[39] Armstrong also charges that the alleged discriminatory royalty was further accentuated by an agreement that Inmont was to receive a 25% "kickback" on royalties that might be paid by Carpenter and Borden. There is clearly no illegality in compensating an agent with a fair commission for his efforts in promoting inventions.[40]

Armstrong further contends that the patents in suit were misused through discriminatory royalty rates charged in licenses to Inmont and Texon. This argument is also without merit. Inmont was charged a royalty rate of 5% on annual sales up to $500,000 and 4% on annual sales above that level.[41] Texon was charged a straight 5% royalty.[42] Again Armstrong has failed to present any evidence that Inmont and Texon compete in any relevant market. In addition, the Texon rate was not discriminatory in light of the fact that Texon only undertook to practice the invention in a limited product area, while Inmont was to practice in a much broader product area and was to sublicense others.

### Violation of the "Lear v. Adkins" Doctrine

In Lear v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Supreme Court expressly overruled its decision in Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), which declared that "The general rule is that the licensee under a patent license agreement may not challenge the validity of the licensed patent in a suit for royalties due under the contract." [43] The decision in Lear struck down the enforceability of contractual provisions which preclude licensees from contesting the validity of the licensed patent.[44] The decision also

---

37. See, Tr. 86, 105, 141, 142.

38. See, Tr. 142, DE–6; DE–6a.

39. See, Tr. 86. DE–6a, which is a hypothetical study of the effect of various royalty rates as applied to the particular type of products, meld of products and quantities which Inmont might be expected to use, is of minor assistance in evaluating which rate is more advantageous to Inmont and of no assistance in determining which rate, if any, would be more advantageous to the other licensees.

40. As discussed earlier, the agency called for Inmont to do substantial development work.

41. See, DE–16.

42. See, DE–20; SF–9. Texon has not reported any sales under its agreement.

43. 339 U.S. 827 at 836, 70 S.Ct. 894 at 899, 94 L.Ed. 1312. Even prior to the Automatic Radio case licensors were not permitted to invoke an estoppel if their licensing agreements contained restrictions that were arguably illegal under the antitrust laws. See, Lear, 395 U.S. at 666, 667, 89 S.Ct. 1902 citing Edward Katzinger Co. v. Chicago Metallic Manufacturing Co., 329 U.S. 394, 67 S.Ct. 416, 424, 91 L.Ed. 374 (1947); Mac Gregor v. Westinghouse Electric & Manufacturing Co., 329 U.S. 402, 67 S.Ct. 421, 91 L.Ed. 380 (1947).

44. These provisions are commonly referred to as "no-contest" clauses.

barred enforcement of royalty provisions against licensees for royalties which would otherwise be due during the time licensees are challenging validity of the licensed patents in the courts.[45] Several recent decisions have held that the *Lear* rational leads to the conclusion that an agreement to accept the validity of a patent is unenforceable regardless of whether it was included in a private settlement or a judicial decree.[46]

Armstrong is not a licensee resisting a suit for past due royalties on the basis that the underlying patent is invalid. Armstrong is an infringer seeking to have the Court bar enforcement of the patents in suit because certain license agreements involving these patents contain provisions which were struck down as unenforceable in *Lear*.

The most significant contention raised by Armstrong in this category is that all of the license agreements under the patents in suit contain a provision which provides that royalties are to be paid, and retained by Congoleum, unless and until there is a final appellate adjudication holding that the patents in question are invalid.[47] Five of these license agreements were executed subsequent to the *Lear* decision.[48] Congoleum concedes that this provision is unenforceable against licensees challenging validity, but argues that it is enforceable

against licensees who sit back and wait for someone else to challenge validity. While Congoleum's position may be correct as against non-contesting licensees,[49] the provision applies to contesting licensees as well.

■ While the Court, of course, does not stamp with approval this provision which is plainly unenforceable against a licensee challenging validity, the application of the doctrine of patent misuse to bar enforcement of Congoleum's patents would be too drastic. Armstrong has not cited legal authority which supports the proposition that the existence of such a clause in a patent license agreement amounts to misuse, and the Court is not persuaded of possible anticompetitive effects resulting from the inclusion of this provision in this case.[50]

Armstrong also contends that Congoleum deliberately flaunted the mandate of the Supreme Court in refusing to delete a "no-contest" clause from a pre-*Lear* license agreement entered into between Congoleum and Mannington Mills in conjunction with the settlement of Congoleum's infringement action against Mannington.[51]

■ In May 1970, Congoleum offered to conform aspects of the Mannington Mills license to a more recent license agreement in accordance with

45. *See,* 395 U.S. 653 at 673, 174, 89 S.Ct. 1902, 23 L.Ed.2d 610. The Supreme Court indicated that it is in the public interest to encourage an early adjudication of validity and set forth several reasons why enforcing a provision requiring a licensee to pay royalties while he is challenging validity would be inconsistent with federal patent policy.

46. *See,* Brose v. Sears, Roebuck & Co., 455 F.2d 763, 767 (5th Cir. 1972); Business Forms Finishing Service, Inc. v. Carson, 452 F.2d 70 (7th Cir. 1971); Massillon-Cleveland-Akron Sign Co. v. Golden State Advertising Co., 444 F.2d 425 (9th Cir. 1971); cert. denied, 404 U.S. 873, 92 S.Ct. 100, 30 L.Ed.2d 117 (1971); Butterfield v. Oculus Contact Lens Co., 332 F.Supp. 750 (N.D.Ill. 1971); Kraly v. National Distillers & Chemical Corp., 319 F.Supp. 1349 (N.D.Ill.1970); Rialto Products Inc. v. Rayex, 166 U.S.P.Q. 222 (N.Y.Sup.Ct.1970); *But cf.* Broadview Chemical Corp. v. Loctite Corp., 474 F.2d

1391 (2d Cir. 1973); Maxon Premix Burner Co., Inc. v. Eclipse Fuel Engineering Co., 471 F.2d 308 (7th Cir. 1972), cert. denied 411 U.S. 940, 93 S.Ct. 1891, 36 L.Ed.2d 402 (1973).

47. *See,* SF–13; DX–1, para. 15; DX–4, para. 10; DX–8, para. 6; DX–9, para. 6; DX–11, para. 6; DX–15, para. 11(a); DX–16, para. 5; DX–20, para. 6; DX–26, para. 6; DX–27, para. 6; *See also,* DX–36, para. 5.

48. *See,* DX–15; DX–16; DX–20; DX–26; DX–27; *See also,* DX–36.

49. *See,* note 45, supra; *See also,* Troxel Manufacturing Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6th Cir. 1972).

50. *See,* Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc., 468 F.2d 225 (7th Cir. 1972).

51. *See,* DX–4; SF 10, 11.

Mannington's most favored licensee clause.[52] At that time Mannington requested that Congoleum delete the "no-contest" clause from its agreement. Based on its view that it was entitled to the equivalent of a judgment on the validity of the patents in suit because the license was part of a litigation settlement, Congoleum refused to delete the "no-contest" clause.[53] In the Court's view, there is no basis for a conclusion that Congoleum's refusal to delete this clause amounts to misuse of the patents in suit. As of the date Congoleum refused to delete the clause in the Mannington settlement license no cases had extended *Lear* to settlement agreements or consent decrees. Even the recent cases cited by Armstrong which hold such "no-contest" clauses unenforceable[54] do not condemn the mere existence of the clause as patent misuse. In addition, there is no evidence in this case to support a conclusion that Congoleum has used the leverage of its legal patent monopoly to reach out for a new monopoly beyond the limits of its grant.[55]

The third contention raised by Armstrong in this category is that the continued existence of "no-contest" clauses in certain Congoleum agreements[56] entered into prior to *Lear* amounts to misuse. This contention is without merit. *See*, Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc., 468 F.2d 225 (7th Cir. 1972); Blohm & Voss A G v. Prudential-Grace Lines, Inc., 346 F.Supp. 1116 (D.Md.1972). Moreover, Armstrong's allegation that a "no-contest" clause was included in a Canadian patent license[57] does not relate to misuse of the United States patents in suit. See, Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 196 Ct.Cl. 35 (1971).

*Pre-Issuance Royalties*

On January 29, 1965 Congoleum licensed United States Rubber Company (U.S. Rubber) to use its know-how and the secret subject matter of its pending patent applications.[58] The inventions described in these applications were disclosed to the public in United States Letters Patents 3,293,094 and 3,293,108 which issued on December 20, 1966. Congoleum's legal monopoly, of course, commenced on that date.

Armstrong, citing Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed. 2d 99 (1964), contends that the license agreement with U. S. Rubber constitutes an illegal extension of the patent monopoly granted on December 20, 1966. *Brulotte*, in declaring that a royalty agreement which projects beyond the expiration date of the patent is unlawful *per se*, stated "If that device were available to patentees, the free market visualized for the post-expiration period would be subject to monopoly influences that have no proper place there." (pp. 32, 33, 85 S.Ct. p. 179). The Court further stated:

"A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly. But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent by tieing the sale or use of the patented article to the sale or use of unpatented ones. . . . The exaction of royalties for use of a machine after the patent has expired is an assertion of monopoly power in the post-expiration period when, as we have seen, the patent has entered the public domain." (p. 33, 85 S.Ct. p. 179)

---

52. *See*, DX–24.

53. *See*, DX–25.

54. *See*, note 46, supra.

55. *See*, Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc., 468 F.2d 225 (7th Cir. 1972).

56. *See*, Armstrong's proposed findings 61, 62, 67; SF–12.

57. *See*, Armstrong's proposed finding 67; SF–12.

58. *See*, DX–1.

The rational of the *Brulotte* decision is not applicable in this instance where the license agreement was in conjunction with an invention that had not become the basis of a patent monopoly and which had not entered the public domain.[59]

Armstrong further contends that the license agreement between U.S. Rubber and Congoleum is unenforceable and, therefore, amounts to patent misuse. Armstrong. relies on Sears, Roebuck & Co. v. Stiffel Co.,[60] Compco Corp. v. Day-Brite Lighting, Inc.,[61] and the dissenting opinion in Lear v. Adkins.[62] In Painton & Company v. Bourns, Inc.,[63] Judge Friendly distinguished the *Sears* and *Compco* cases, where State law conferred a monopoly, from trade secret agreements, where only the licensee is bound and all others are free to practice the secret if they can figure out what it is. *See also,* Krampe v. Ideal Industries, Inc., 347 F.Supp. 1384 (N.D. Ill.1972); San Marino Electronic Corp. v. George J. Meyer Co., 155 U.S.P.Q. 617 (C.D.Cal.1967); 35 U.S.C. § 261. The Court is not persuaded that the agreement between U.S. Rubber and Congoleum would be unenforceable, and, at any rate, there is no basis for finding an unlawful extension of Congoleum's legal patent monopoly.

### Post-Expiration Royalties

The defendant contends that the Inmont automotive agreement,[64] whereby Inmont was granted a license to practice the inventions in the automotive field under the two United States patents in suit and five Canadian patents, required Inmont to pay post-expiration royalties. The United States patents in suit expire on December 19, 1983, and the five Canadian patents expire about 6 months later. The agreement provided that Inmont was required to pay royalties for the practice of the inventions of the patents based on net sales of products produced under the patents, and that the royalty rate would vary depending on the class of product produced under the patents.[65] The agreement further provided in paragraph 8 that "Unless terminated as herein provided, the agreement will continue in full force and effect until the expiration of the Patent latest in· date of original issue." Paragraph 9(b) provided that the licensee could terminate the agreement at any time by giving 3 months written notice.

Armstrong relies primarily on Brulotte v. Thys Co., 379 U.S. 29, 85 S. Ct. 176, 13 L.Ed.2d 99 (1964), in support of its argument that paragraph 8 in the automotive license is *per se* patent misuse. The *Brulotte* decision, discussed earlier, emphasized that a patentee cannot use the leverage of his legal patent monopoly to exact royalties beyond the term of the legal monopoly. In *Brulotte* the owner of several patents in the art of hop-picking sold machines incorporating his patented mechanisms for a fixed price and issued licenses with royalty payments based on the use of the machines. The machines embodied seven patents and the license agreements required royalty payments for the use of the machines even after all seven pat-

---

59. 35 U.S.C. § 122 provides:
    "Applications for patents shall be kept in confidence by the Patent Office and no information concerning the same given without authority of the applicant or owner unless necessary to carry out the provisions of any Act of Congress or in such special circumstances as may be determined by the Commissioner."

60. 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

61. 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

62. *See,* 395 U.S. 653 at 677, 89 S.Ct. 1902, 23 L.Ed.2d 610. Armstrong also cites Pollack v. Angelus Block Co., Inc., 171 U.S.P.Q. 182 (Cal.Sp.Ct.1971), which held that once an inventor has disclosed his unpatented invention to the general public it becomes public domain, but that a confidential license agreement in conjunction with the subject matter of a pending patent application would not put the invention in the public domain.

63. *See,* 442 F.2d 216, 223 (2d Cir. 1971).

64. DX–8; SF–4. *See also,* note 17 and accompanying text, *supra.*

65. *See,* DX–8, paras. 1(a), 2(a).

ents had expired. The license agreements also precluded assignment or removal of the machines from the county even after expiration of all the patents. The licensor attempted to continue to collect royalties after all the patents had expired, but the Supreme Court denied this relief citing Ar-Tik Systems, Inc. v. Dairy Queen, Inc., 302 F.2d 496, 510 (3d Cir. 1962), and stating "after expiration of the last of the patents incorporated in the machines the grant of the patent monopoly was spent."

The present action is distinguishable in several respects. Initially, it is important that there is no evidence that the United States patents in suit were used as leverage to exact any of the contractual provisions. On the contrary, the unrefuted evidence is that Inmont, the licensee, requested the inclusion of the Canadian patents so it could practice the invention in Canada.[66] A fundamental difference is the nature of the patent rights granted. In *Brulotte* the licensee was granted rights under several patents embodied in a machine and was bound to pay royalties based on the use of the machine even after all the patents embodied in the machine had expired. In the present case the patent rights granted under the five Canadian patents permit the licensee to practice the inventions of the Canadian patents in Canada and require him to pay royalties under the Canadian patents. The patent rights granted under the United States patents in suit, of course, permit the licensee to practice the inventions in the United States and require him to pay royalties under the United States patents. In the Court's view the logical reading of the license is that, unless terminated, the agreement will continue to grant rights and obligations under the Canadian patents even after the United States patents have expired. The Court

cannot agree with Armstrong's contention that the agreement requires royalties for using the invention in the United States even after the United States patents have expired. In addition, it is significant that the license in the present case provided that the licensee could terminate the agreement at any time by giving three months notice. Armstrong contends that the court in American Securit v. Shatterproof Glass Corp., 268 F.2d 769 (3d Cir. 1959) made "short shrift" of an almost identical provision. In that case the Court first concluded that the licensor had maintained a policy of requiring its licensees to accept package licensing. It followed that the termination clause, instead of being a redeeming feature, would work a hardship on the licensee "in that it demands the renunciation of all patents, whether wanted or unwanted under the license." In the present case there is no evidence that Congoleum engaged in a policy of mandatory package licensing. The termination clause clearly benefits the licensee. The present case is, of course, also distinguishable in that the legal monopoly has not expired. In the Court's view, the automotive license did not require Inmont to pay post-expiration royalties.

Additionally, the defendant contends that the Congoleum license to GAF Corporation (GAF)[67] requires GAF to pay royalties for practicing the invention in the United States subsequent to the expiration date of the patents in suit. Armstrong states that GAF must pay a minimum royalty each year through 1983 without regard to GAF's exercise of a right to terminate the license and without regard to whether claims of the patent are held invalid.[68] Even assuming that GAF has contracted to continue paying minimum royalties[69] throughout the term of the

---

66. *See*, Tr. 95–97.

67. *See*, DE–15. The GAF license agreement was entered into in conjunction with the settlement of Congoleum's patent infringement action against GAF.

68. *See*, DE–15, paras. 1(b), 6(b), 9(d), 11(a).

69. Armstrong does not allege that these royalties were exorbitant.

patent monopoly, there has been no showing that these royalties must continue subsequent to the expiration date [70] of the legal monopoly. While minimum royalties continue despite a partial holding of invalidity, the Court is not persuaded that these royalties must continue beyond a final adjudication holding all claims invalid. Armstrong's argument fails to support a conclusion of patent misuse.

The Court concludes that the patents in suit have not been misused, and, therefore, does not reach the question of whether misuse was purged.