The **LAITRAM CORPORATION,**
Plaintiff,

v.

**KING CRAB, INC.,** a corporation,
Defendant.

**Civ. No. A–32–62.**

United States District Court
D. Alaska.

Aug. 19, 1965.

For supplemental opinion see 245 F. Supp. 1019.

W. C. Arnold, Anchorage, Alaska, W. R. McKelvy and James L. Magee, of Skeel, McKelvy, Henke, Evenson & Uhlmann, Seattle, Wash., John Loflin, Jr., Hancock Griffin, Jr., and Guy Shoup, New York City, for plaintiff.

Warren W. Matthews, Jr., of Burr, Boney & Pease, Anchorage, Alaska, Thomas J. Greenan and Edward Hilpert, Jr., of Ferguson & Burdell, Seattle, Wash., for defendant.

HODGE, Chief Judge.

This is an action for an injunction against infringement by defendant of letters patent issued to the plaintiff and its predecessors in interest and for an

accounting for damages. The action arises under the patent laws of the United States, and jurisdiction is founded upon Title 28 U.S.C. § 1338(a) and Title 35 U.S.C. § 281.

## ADMITTED FACTS

The facts upon which the plaintiff bases its claim and the defendant bases its defense are not substantially in dispute and may be briefly stated as follows:

The plaintiff Laitram Corporation is a corporation organized under the laws of the State of Louisiana with its principal place of business in New Orleans. It is the successor to the Peelers Company, a partnership in commendam, which was formed under Louisiana law in 1951, under which law such partnership is composed of two types of partners: general partners responsible for the direction, control and formulation of policies of the partnership, and partners "in commendam," who are prohibited from participating in the direction and control of the partnership. The Peelers Company was a successor in interest to Peelers, Inc., a Louisiana corporation. Ownership and control of the Laitram Corporation and Peelers, Inc. are substantially the same as that of the Peelers Company, and the plaintiff will be hereafter designated as "Peelers."

Ownership and control of these organizations has always been vested in some six individual members of the Lapeyre family, of Houma, Louisiana. These same individuals have also retained ownership and control of a Louisiana shrimp packing company, Grand Caillou Packing Company, a Louisiana corporation with plant situated at Houma. One member of the family, Felix H. Lapeyre, has been general counsel for both organizations since the formation thereof.

Peelers is engaged in the business of manufacturing, leasing and selling of patented shrimp peeling and processing machinery. Grand Caillou Packing Company is engaged in the business of canning shrimp and other seafood products.

Plaintiff and its predecessors in interest are the owners of three United States patents issued upon the application of Fernand S. Lapeyre and his nephew James M. Lapeyre, these patents consisting of #2,429,828 issued October 28, 1947; #2,537,355 issued January 9, 1951, and #2,574,044 issued November 6, 1951, all covering a shrimp peeling machine and improvements thereon.

Defendant King Crab, Inc. is a corporation having at the time of the commencement of this suit a place of business at Kodiak, Alaska, engaged in the business of canning shrimp, and was at the time of the commencement of this suit using in its plant at Kodiak three Skrmetta shrimp peeling machines for peeling shrimp.

In an action in the District Court of the Western District of Washington, Southern Division, entitled "The Peelers Company v. Kaakinen et al.," decided February 26 and April 11, 1960 (126 U.S.P.Q. 42), District Judge George H. Boldt held that the patents in suit were valid and were infringed by the defendant Kaakinen by use of the Skrmetta shrimp peeling machine. This decision was affirmed by the United States Circuit Court of Appeals for the Ninth Circuit in Kaakinen v. Peelers Company, decided January 22, 1962, 9 Cir., 301 F.2d 170.

The inventions in suit were actually first discovered by James M. Lapeyre and were first constructed in sufficient volume for use in the shrimp canning plant of the Grand Caillou Packing Co.

Previously to this invention shrimp canning of raw shrimp had been confined entirely to the Louisiana and Gulf coast areas, canning a variety of shrimp. The shrimp peeling machine was first offered on the market in 1949. Peelers employed one L. W. Strasburger, an expert in shrimp analysis and production, who made a survey of the relative cost of peeling shrimp by hand or by machine, upon which basis a rental charge for the use of the machines was established at 55¢ per unit increase, that is per 100 roller cycles of the machine, which it

was determined would afford the company a reasonable return and the lessees a substantial saving compared to the cost of hand peeling. In 1951 a cleaner was offered as an adjunct to the peeler but no additional charge was made. In 1953 a separator was added and Peelers charged an additional 5% of the rental of the peeling machine for the use of such separator. Up until 1964 the machines were only leased, as it was determined that the market was not sufficient to justify continued production by selling the machines.

The success of plaintiff's machines embodying the patented combinations was substantial and immediate and actually caused a wholly new method of peeling shrimp by machinery instead of by hand labor.

In 1956 and 1957 Peelers entered into negotiations with canneries in Washington, Oregon and Alaska, for the lease of peeling machines. When such machines were installed the lease rental was fixed at exactly double the charge then being made on the Gulf coast, that is $1.10 per unit increase of the machine.

In June of 1957 all lessees of both the Gulf and Northwest coasts were advised that effective June 1, 1960, the rental charge would be increased one-third on account of the cost of production and based upon an increase in the minimum wage law of the United States, which raised the cost of peeling, cleaning and separating machines of the Gulf coast lessees from 57.75¢ per 100 roller cycles to 77¢, and the cost to the West coast canneries for the same equipment was raised from $1.155 to $1.54 per 100 roller cycles.

In 1959 Peelers notified its lessees that they had determined upon a number of intermediate rates numbered from one to nine, based upon the number of shrimp per pound varying from number 1 at 55¢ to number 9 at $1.10 per unit increase, but it was conceded that the Gulf packers were at all times charged the number 1 rate and the Northwest packers at all times the number 9 rate.

The shrimp canned in the Gulf area were of the penaeid species, whereas the shrimp canned in the Northwest and Alaska were much smaller and were of the pendalid species.

Commencing in 1958, following efforts to lease its machines in foreign countries, Peelers instituted a program of selling such machines and up to October, 1963, some 30 machines were sold in countries including Norway, Panama, Iceland, Greenland, Sweden, India, Denmark, Chile, Japan, and Canada. No machines were sold in the United States until after the decision of the Federal Trade Commission, in 1964.

On June 4, 1964, the Federal Trade Commission issued its order in the matter of the Grand Caillou Packing Company, Inc., its officers and directors and the Peeler's Company, Docket No. 7887, based upon the opinion of the Commission by Commissioner MacIntyre and a separate opinion of Commissioner Elman, following an extensive hearing, ordering the respondents to "cease and desist" from:

(1) Discriminating between lessees of the Peeler's machinery by charging higher rental or use rates to any lessee than are charged to any other lessee; and

(2) Discriminating between foreign and domestic shrimp processors by refusing to sell such machines to domestic processors on the same terms and conditions afforded to foreign processors.

It is understood that this order is on appeal, but in May of 1963, following the hearing examiners' initial decision, Peelers notified all lessees that each would be charged the same rental or use rate.

## PLEADINGS AND ISSUES

Defendant filed an answer generally denying the allegations of plaintiff's complaint and alleging by way of affirmative defenses that plaintiff's patents were invalid and that plaintiff was not entitled to the relief sought for the reason that it has abused and misused the patents which are the subject of this suit, and has violated the antitrust laws of the

United States by acts and charges which will be set forth hereinafter.

On May 25, 1962, the Court granted plaintiff a preliminary injunction in favor of the plaintiff on the question of infringement and validity of the patents.

This Court held prior to the trial and again finds that the decision of the United States District Court for the Western District of Washington in the Kaakinen case above mentioned, affirmed on appeal by the United States Court of Appeals for the Ninth Circuit, upon which certiorari was denied by the United States Supreme Court, 371 U.S. 823, 83 S.Ct. 40, 9 L.Ed.2d 62, although not res judicata in this case, as the parties were not the same, is binding upon this Court as authority for the reason that the patents in suit and the Skrmetta shrimp peeling machines were in all material respects identical with the machines involved in the Kaakinen case; and that the use of the Skrmetta peeling machines constituted an infringement of plaintiff's three patents.

In defendant's third defense, contained in paragraph 16 of its answer, defendant alleged misuse of the plaintiff's patents by violation of the antitrust laws of the United States by the following acts and conduct:

(a) Entering into agreements with patentees and prospective patentees, thus obtaining exclusive rights to shrimp processing machines; and in most instances never attempting to manufacture, develop or commercially exploit such machinery;

(b) Acquiring from inventors, rights to all their future inventions in this field;

(c) Filing patent infringement suits against manufacturers and users of competitive shrimp peeling machines and offering unfair selling terms to purchasers and prospective purchasers of these machines located in foreign countries;

(d) Requiring licensees, as a part of the consideration for leasing the ma-

chines, to purchase debentures issued by the plaintiff;

(e) Charging, or attempting to charge, lessees or prospective lessees of its machines in Oregon, Washington and Alaska, discriminatory and much higher rates than those granted lessees in other states;

(f) Selling its machines to shrimp processors in foreign countries, but refusing to sell said machines to shrimp processors in Washington, Oregon and Alaska, which processors are in competition with foreign purchasers of said machine.

(g) Requiring from time to time, by various lease provisions, licensees of its machines in Oregon, Washington and Alaska to obtain repair parts for said machines only from the plaintiff;

(h) Requiring licensees in Oregon, Washington and Alaska to lease shrimp cleaning machines from plaintiff in order to obtain from plaintiff a lease of shrimp peeling machines.

(i) Combining, agreeing and conspiring with Grand Caillou Packing Company, Inc. in an attempt to monopolize the business of processing, canning, selling and distributing shrimp in interstate and foreign commerce.

(j) Combining, agreeing and conspiring with Grand Caillou Packing Company, Inc., in an attempt to restrain trade in the business of processing, canning, selling and distributing shrimp in interstate and foreign commerce.

(k) Attempting to monopolize, and monopolizing, the business of manufacturing, developing, leasing, licensing and selling shrimp processing machinery.

The case was tried to the Court upon this issue alone. At the conclusion of the defendant's case the Court sustained a motion to strike item (d) relating to the requirement to purchase debentures issued by the plaintiff upon the ground that the issuance of such debentures was part of the consideration paid by the lessees for the lease and did not constitute a mis-

use of plaintiff's patents. The Court also sustained a motion of the plaintiff to dismiss items (g) and (h) relating to the requirement that the lessees obtain repair parts for the machines only from the plaintiff and that they were required to lease a shrimp cleaning machine along with the lease of the shrimp peeling machine for the reason that it developed that these practices had been discontinued prior to the infringement in this suit.

At the conclusion of the trial the Court also sustained plaintiff's motion to strike items (i) and (j) charging a conspiracy with Grand Caillou Packing Company in an attempt to monopolize the business of processing, canning, selling and distributing shrimp and an attempt to restrain trade in the same, for want of sufficient proof to sustain the allegations of conspiracy. Findings of Fact and Conclusions of Law were entered accordingly, pursuant to the provisions of Rule 41(b), Federal Rules of Civil Procedure, as such motion to dismiss affirmative defenses was analogous to a defense motion for involuntary dismissal under such Rule as stated by the Supreme Court in the case of Byrd v. Blue Ridge Cooperative, 356 U.S. 525, at p. 532, 78 S.Ct. 893, 2 L.Ed.2d 953.

The remaining charges of misuse will be discussed in the order pleaded, after first considering the matter of the misuse of patents generally by violation of the antitrust laws.

It is held by the United States Supreme Court in the case of Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, that the use of a patent monopoly to restrain competition in the marketing of unpatented tablets for use with the patented machines, and to aid in the creation of a limited monopoly in such tablets is not within the monopoly granted by the patent and is contrary to the public policy of the United States evinced by the Constitution and the patent law, and that the patentee while engaging in such practice may not have an injunction to restrain the making and leasing of infringing

machines. This principle is based in part upon the maxim of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right contrary to the public interest.

In the case of Sperry Products, Inc. v. Aluminum Company of America, 171 F.Supp. 901, it is stated, citing the Morton Salt Co. case, that the doctrine of misuse rests upon the principle that the holder of an exclusive privilege granted in furtherance of public policy may not claim protection of his grants by the courts where such monopoly or such patent privilege is being used to subvert that policy.

See also Toulmin's Anti-Trust Laws, Volume 4, Chapters 7 and 24, and especially Sections 7.29 and 24.2 relating to the defense that patents have been misused or used to violate the antitrust laws, which has been recognized in many infringement suits.

██ It is the public interest which is dominant in the patent system. See Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376, and United States v. Masonite Corp., 316 U.S. 265, 280, 62 S.Ct. 1070, 86 L.Ed. 1461.

(a) ENTERING INTO AGREEMENTS WITH PATENTEES AND PROSPECTIVE PATENTEES THUS OBTAINING EXCLUSIVE RIGHT TO SHRIMP PROCESSING MACHINES

██ In this connection defendant contends that while these contractual relations with inventors or potential inventors were not illegal per se, when considered in the light of all activities of the plaintiff and its predecessors constituted a course of conduct violative of Section 2 of the Sherman Act, citing the case of United States v. Besser Mfg. Co., 96 F. Supp. 304, aff'd 343 U.S. 444, 72 S.Ct. 838, 96 L.Ed. 1063.

In Besser the court found evidence of a conspiracy and monopoly in the elimination of Besser's chief competitors, which was found to be illegal, which does not apply in this case. The evidence in

this case showed that all of the patents accumulated by plaintiff covering shrimp peeling machines were voluntary and were developed by research of persons in its own organization. Also that only two of such agreements were entered into by plaintiff with inventors of shrimp peeling machines,—Messrs. Peuss and Samanie—and that plaintiff in good faith spent considerable time and money in an endeavor to develop these machines, but these efforts were unsuccessful and the license rights to these machines were returned to the inventors. A special agreement with Samanie covering a separating machine is not involved here. It is held generally that only agreements with patentees to assign inventions or patents which affect restraint in trade or grant monopoly, or if designed for that purpose, are in violation of the antitrust law. Kobe, Inc. v. Dempsey Pump Co., (C.A. 10) 198 F.2d 416; Dollac Corporation v. Margon Corporation, D.C., 164 F.Supp. 41; Sperry Products, Inc. v. Aluminum Company of America, supra; United States v. L. D. Caulk Company, D.C., 126 F.Supp. 693.

In the case at bar I find that the assignments or licenses of inventions did not create any such restraint of trade or monopoly and were not designed for that purpose, and that this affirmative defense cannot be sustained under the evidence adduced at the trial.

(b) ACQUIRING FROM INVENTORS RIGHTS TO ALL THEIR FUTURE INVENTIONS IN THIS FIELD

This charge apparently refers to evidence showing that certain employees of Peelers had assigned to plaintiff, in connection with their employment, rights to any future inventions in the field of shrimp processing machinery. The principles governing this situation are substantially the same as those governing the charge in item (a). I find that the evidence fell far short of showing that such agreements constituted a restraint of trade or monopoly or any misuse of plaintiff's patents.

(c) FILING PATENT INFRINGEMENT SUITS AGAINST MANU- FACTURERS OR USERS OF COM- PETITIVE SHRIMP PEELING MACHINES

The evidence disclosed that the plaintiff and its predecessor the Peelers Company have instituted a number of patent infringement suits in various parts of the country against users of the Skrmetta machine, some of which are still pending, and contends that this course of action was "obviously" a part of an overall plan to monopolize and retain exclusive control of high-capacity, bulk-feed shrimp processing machinery, citing Kobe, Inc. v. Dempsey Pump Co., supra, and American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575.

These cases do so hold where the purpose in bringing the infringement actions was to further an existing monopoly and eliminate competitors or potential competitors. However, the evidence here discloses instead that the filing of infringement suits was done in good faith and there is no competent evidence that such actions were taken to create a monopoly or in restraint of trade. There is no violation of the antitrust laws in such case. Dollac Corporation v. Margon Corporation, supra; Cole v. Hughes Tool Company, 10 Cir., 215 F.2d 924; Eversharp, Inc. v. Fisher Pen Co., D.C., 204 F.Supp. 649, 674. The patent law specifically provides that:

"No patent owner otherwise entitled to relief for infringement * * of a patent shall be denied relief or deemed guilty of misuse * * * by reason of his having * * * (3) sought to enforce his patent rights against infringement * * *." 35 U.S.C. § 271(d).

The evidence also disclosed that plaintiff sent notices to its lessees of the pending infringement suits involving use of the Skrmetta machines, but the evidence likewise failed to disclose that such action was not taken in good faith or was motivated by the purpose of enlarging the scope of monopoly created by the patents. There is likewise no violation of the antitrust laws in such case.

Sperry Products, Inc. v. Aluminum Company of America, supra, 171 F.Supp. p. 929.

(e) DISCRIMINATION IN RATES BETWEEN LESSEES OF MACHINES IN OREGON, WASHINGTON AND ALASKA AND LESSEES OF MACHINES IN THE GULF AREA

■ The matter of the rates to be charged the Northwest and Alaska lessees was referred to Felix Lapeyre, lawyer-partner of the Peelers Company, who testified that the reason for the double rate was that he had been informed that the shrimp in the Pacific Northwest area was on the average approximately half the size of the average size of shrimp in the Gulf area, that it takes the same length of time to peel small shrimp as large shrimp, and therefore the peeling of shrimp in the Northwest and Alaska areas represented a double saving in hand labor cost.

Plaintiff argues that this double rate was entirely proper and did not constitute a misuse of plaintiff's patents, arguing, amongst other things, that plaintiff, as the holder of valid patents on its peeling machines, did not have to lease the machines at all to the Northwest lessees and that the rate for such lessees was not inconsistent from the benefits flowing from the operation; but the cases cited in support of these contentions do not deal with the matter of discriminatory rates.

It was conceded that Mr. Felix Lapeyre had no experience in the shrimp canning business and made no particular inquiry as to the actual cost of peeling shrimp in the Northwest area. The evidence also disclosed that consideration was not given in fixing such double rate to what is known as the "yield" of shrimp in the canneries, that is, the amount of canned shrimp which would be produced from 100% of raw head-on penaeid shrimp, which was found to be 33%, and the amount of canned shrimp produced from 100% of raw head-on pendalid shrimp, which was found to be from 11% to 17%.

The evidence also disclosed that with one exception, being Emil Engdal, of Wrangell, the rate fixed in the Northwest and Alaska areas was prohibitive, such that these canneries could not economically compete with shrimp processors in the Gulf area. Mark A. Jensen, well-known Northwest broker, testified that King Crab did not lease Peelers' machines as they could not operate at a profit under the lease rates.

When the Northwest packers first learned of such double rate, complaint was made to one of the general partners of Peelers and a meeting between representatives of Peelers and representatives of the Northwest canneries was held at Seattle to protest such rates, to no avail.

That the double rate was arbitrary and not based upon any rational basis is further shown by two things:

(1) The notice to lessees by letter dated May 19, 1959, setting up a supposedly new lease rental correlated to the average size of shrimp to be peeled and cleaned by the lessees, but keeping the Northwest and Alaska packers at the highest rate and the Gulf packers at the lowest; and

(2) The notice to lessees in 1957 increasing the rates by one-third by reason of the increase in the minimum wage law of the United States, whereas no inquiry was made by Peelers as to the fact that the increase in the minimum wage law did not in any way affect the wages paid to cannery workers in the Pacific Northwest and Alaska.

Plaintiff introduced statements of income prepared by qualified accountants of ten of the Northwest and Alaska lessees beginning with the year 1957, from which defendant has computed total net losses of these packers for the years 1957 through 1962 of $290,478.64, and total rentals paid of $1,028,677.26, from which analysis defendant computes the total profits, if these lessees had been charged the same rental rates as the Gulf lessees, of $223,859.99. Without verifying these figures from the exhibits it does appear

that these Northwest and Alaska lessees suffered substantial losses which would have been avoided had they been charged the same rental rate as the Gulf lessees. In fact, the evidence showed that some of these canneries were actually forced out of business on account of the excessive rental rates.

In an apparent effort to show other causes contributing to such losses, plaintiff's counsel employed one Edith L. Lind in 1962 to make purchases of canned shrimp in cities throughout the United States, and again employed one Jeffery Flowers to make purchases of canned shrimp in 1964, all of which were submitted to Mr. Strasburger, who made detailed analysis of these samples and who found that the samples obtained by Ethel Lind from the Pacific Northwest and Alaska canneries contained defects, and as to the samples obtained by Mr. Flowers, all except one from the Northwest and Alaska areas were rated "poor." However, this testimony was not particularly impressive as it was not shown that the quality of the products in any way had contributed to a decrease in the sales of the Northwest and Alaska canneries; nor do I find in these factors any justification for the discriminatory rates.

The precise question before this Court has not been decided in any case cited by defendant. However, we are not without some legal precedent in the matter.

In the case of United States v. United Shoe Machinery Corp., (D.C.Mass.1953) 110 F.Supp. 295, it is held that price discrimination in leasing arrangements covering shoe manufacturing machines relating to different types of machines which results in monopolizing or attempting to monopolize trade or commerce amongst the several states is not justified by the patent laws of the United States, but in effect constitutes a monopoly in violation of Section 2 of the Sherman Act, citing Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. American Tobacco Co., 221 U.S.

106, 31 S.Ct. 632, 55 L.Ed. 663, and an enlightening opinion of Judge Learned Hand in United States v. Aluminum Co. of America, (C.C.A. 2, 1945) 148 F.2d 416, in which it is held that the question of intent to create a monopoly may be disregarded.

Most of the cases cited by both parties do not relate to actions for patent infringement but relate to prosecutions by the United States for injunctive relief or private antitrust actions for violation of the Sherman Act. However, it does appear from these cases that the power to control or manipulate prices in an industry constitutes a monopoly.

As stated by Commissioner Elman in his concurring opinion in the Federal Trade Commission case, the right of a monopolist created by patent to exploit the monopoly conferred by such patent by charging a discriminatory price rate does not include the right to destroy or cripple a major segment of an industry, but must yield in such case to the policy of eliminating competition embodied in the antitrust law; and that plaintiff's refusal to treat the Northwest and Gulf coast shrimp canners on equal terms is an abuse of monopoly power in that plaintiff has "substantially and unjustifiably injured competition in the shrimp canning industry." See also United States v. Masonite Corp., 316 U.S. 265, 277, 62 S.Ct. 1070, 86 L.Ed. 1461; Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 515, 37 S.Ct. 416, 61 L.Ed. 871.

It must be concluded, therefore, that the plaintiff is not entitled to an injunction or damages against the defendant during the period within which the double rates were effective, which is stipulated to be between September of 1958 and the date of the preliminary injunction granted on May 8, 1962.

(f) SELLING ITS MACHINES TO SHRIMP PROCESSORS IN FOREIGN COUNTRIES BUT REFUSING TO SELL THE MACHINES TO SHRIMP PROCESSORS IN

WASHINGTON, OREGON AND ALASKA

■ It was acknowledged by the Court throughout the trial, upon repeated objections made by counsel for plaintiff, that we were not concerned here with plaintiff's foreign patents but only with the question of whether the refusal of Peelers to sell machines to shrimp processors in the Northwest and Alaska, which were in competition with foreign purchasers, constituted an unlawful discrimination in violation of the antitrust laws.

It is held in the case of United States v. United Shoe Machinery Corp., supra, 110 F.Supp. at p. 340, that the leasing of machinery and refusing to sell does not constitute an unlawful practice in violation of the Sherman Act where the rates are uniform and do not create barriers to entry by competitors into the same field.

In the case of Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, the Supreme Court, in a lengthy opinion involving a suit for an injunction for violations of the antitrust laws, found a conspiracy to restrain trade and to monopolize, and entered an order to correct the evils of monopolization. The opinion, at p. 420, 65 S.Ct. at p. 390, states as follows:

"The decree should permit any corporate appellant, acting alone, to lease or sell patented machinery or license the use of patents, if it so elects, provided always that no· discrimination be practiced and that no restrictive conditions be attached."

The evidence did not reveal any unlawful purpose in the selling of the machines in foreign countries, and in fact the reasons assigned for the necessity of selling in foreign countries rather than leasing appear to be reasonable and practical, in that plaintiff's leasing program was not successful abroad and, faced with problems relating to export and regulations, plaintiff found that in order to utilize its foreign patents and to develop potential foreign markets, it would have to sell its machines abroad.

Defendant offers no authority to support its contention that plaintiff misused the patents in suit by refusing to sell the peeling machines to United States packers other than the matter of price discrimination discussed above. Plaintiff had the right under its patents to either sell or lease the peeling machines.

(k) ATTEMPTING TO MONOPOLIZE AND MONOPOLIZING THE BUSINESS OF MANUFACTURING, DEVELOPING, LEASING, LICENSING, AND SELLING SHRIMP PROCESSING MACHINERY

■ In connection with this contention attention is especially directed to the opinion of Judge Learned Hand in the case of United States v. Aluminum Co. of America, supra, especially at pages 148 F.2d 427 to 430, in which it is held that an enterprise has achieved monopoly where it has put an end to existing competition or has prevented such which were not economically inevitable, but rather by reason of the firm's method of doing business. In this case it is noted that the Alcoa Company, which was involved, is held to have control over 90% of the aluminum market and did actually exclude competitors as to any newcomers in the field.

See also the case of United States v. United Shoe Machinery Company, above, which quotes from the Aluminum Company case, and states that an enterprise has monopolized, in violation of Section 2 of the Sherman Act, if it has acquired the power to exclude competitors as the result of using an unreasonable restraint of trade (110 F.Supp. p. 342). To the same effect, see American Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575.

A slightly different approach to this question appears in the opinion of Justice Douglas in the case of United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236, concluding that an enterprise has monopolized in violation of Section

2 of the Sherman Act if it has the power to exclude competitors and has exercised it. See also the early case of United States v. American Tobacco Co., supra, in which it is held generally that the words "restraint of trade" in the common law in force at the time of the adoption of the antitrust act embraced acts, contract agreements or developments which operated to the prejudice of the public interest by unduly restricting competitors or unduly obstructing the due course of trade.

The evidence failed to disclose any such monopoly, exercised or attempted, with relation to the manufacture, leasing and licensing or selling of shrimp processing machinery other than the matter of price discrimination discussed above. In fact, the evidence disclosed that there were no competitors with the Peelers' machine except the infringing Skrmetta machines, and no such competitors appeared.

Defendant, in its trial memorandum, takes the position that the only reason that plaintiff was able to charge the discriminatory rates was because it had complete economic monopoly, citing a number of cases regarding what constitutes a monopoly under the Sherman Anti-Trust and the Clayton Acts, but we do not find this position sustained by the evidence.

Finally, the situation as it appears is quite different than the monopoly found by the United States Court of Appeals for the Ninth Circuit in the recent case of Jerrold Electronics Corporation et al. v. Wescoast Broadcasting Co., Inc., decided January 22, 1965, 9 Cir., 341 F.2d 653.

### CONCLUSION

For the reasons assigned under the affirmative defense (e) with regard to charging discriminatory rates only, I find that the plaintiff is not entitled to recover damages.

■ However, plaintiff having now purged itself of the practice of charging discriminatory rates, the prayer for a permanent injunction should be granted.

Sylvania Industrial Corporation v. Visking Corporation, 4 Cir., 132 F.2d 947, 958.

Judgment may be entered by the Clerk dismissing plaintiff's claim for an accounting for damages.

A permanent injunction may be prepared by plaintiff and submitted, enjoining the defendant from leasing or using the infringing Skrmetta machines.

The preliminary injunction issued May 25, 1962, may be quashed, and plaintiff's bond exonerated.

■ Both parties having prevailed in part, it would seem just and proper that no costs be taxed to either party and that no attorneys' fees be allowed.

No further Findings of Fact or Conclusions of Law will be necessary.